# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**GLENDA W. WEEKLEY,**
      **Plaintiff,**

**v.**                            **Case No. 3:10cv427/RV/CJK**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**
      **Defendant**.

---

## REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Northern District of Florida Local Rules 72.1(A), 72.2(D), and 72.3, relating to review of administrative determinations under the Social Security Act ("Act") and related statutes, 42 U.S.C. §§ 401-1400v. The case is now before the court pursuant to 42 U.S.C. § 405(g), for review of a final determination of the Commissioner of Social Security ("Commissioner") denying claimant's application for disability insurance benefits under Title II of the Act, 42 U.S.C. §§ 401-34.

Upon review of the record before this court, I conclude that the findings of fact and determinations of the Commissioner are supported by substantial evidence. The decision of the Commissioner therefore should be affirmed.

## PROCEDURAL HISTORY

On March 17, 1997, Glenda W. Weekley (who will be referred to by name, as plaintiff, or as claimant) protectively filed an application for disability insurance

benefits, alleging disability beginning October 2, 1989.  T. 142.  Claimant's application was denied initially and on reconsideration.  T. 128, 132.[1]  Claimant appealed and requested a hearing, which was held before an administrative law judge ("ALJ") on April 2, 1998.  T. 133, 136.  At the hearing, plaintiff appeared and testified, amending her alleged onset of disability date to January 1, 1997.  T. 194-95. Following the receipt of post-hearing evidence, a supplemental hearing was held on June 29, 1999, at which time claimant and Dr. J. Scott Lankford, an impartial vocational expert, appeared and testified.  In a decision dated November 24, 1999, the ALJ found that plaintiff was not disabled under the Social Security Act at any time through the date of the decision.  T. 29-42.  The Appeals Council of the Social Security Administration denied plaintiff's request for review on March 22, 2002.

On April 18, 2002, Mrs. Weekley commenced a civil action in this court, which issued an order reversing and remanding the administrative decision.  T. 842-43.  The matter was reassigned to ALJ Maggard, who issued an unfavorable decision on June 14, 2005.  T. 1044-68.  On May 17, 2007, the Appeals Council vacated the unfavorable decision and remanded the case to the ALJ for further proceedings.  T. 1071-75.  Pursuant to the Appeals Council remand order, a hearing was held on October 22, 2007, at which time the claimant appeared and testified.  Leslie A. Gillespie, an impartial vocational expert, also appeared and testified at the hearing. The ALJ issued a decision on January 31, 2008, finding claimant was not under a disability as defined in the Social Security Act at any time from the amended alleged onset date through December 31, 2002, the date last insured.  T. 814-28.  The Appeals

---

[1] The administrative record, as filed by the Commissioner, consists of eight volumes (doc. 6 through 6-7), and has 1,207 consecutively numbered pages.  References to the record will be by "T." for transcript, followed by the page number.

Council declined jurisdiction in a notice dated February 14, 2010.  T. 797-800.  The ALJ's January 2008 decision thus stands as the final decision of the Commissioner and is now subject to review in this court pursuant to section 1383(c) of the Act.

FINDINGS OF THE ALJ

In the most recent written decision the ALJ made several findings relative to the issues raised in this appeal:

1.  Claimant last met the insured status requirements of the Social Security Act on December 31, 2002.

2.  Claimant did not engage in substantial gainful activity during the period from her amended alleged disability onset date of January 1, 1997 through her date last insured of December 31, 2002.

3.  Through the date last insured, claimant possessed the following severe impairments:  status post cervical diskectomy and fusion, status post re-do cervical diskectomy and fusion with instrumentation, cervical degenerative disc disease, and muscle tension headaches.

4.  Through the date last insured, claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.  Through the date last insured, claimant retained the physical residual functional capacity to perform at least at the sedentary strength or exertional level, in function-by-function physical terms, with certain exertional and postural restrictions associated with that level of exertion.  Claimant's specific physical capacities and limitations during the period of adjudication were the ability to sit for two hours at a time, up to a total of four hours during an eight-hour workday, the ability to stand

for one hour at a time, up to a total of two hours during an eight-hour workday, the ability to walk for four hours at a time, up to a total of six hours during an eight-hour workday, the ability to frequently lift and carry up to ten pounds, the ability to occasionally lift and carry 11 to 20 pounds, the ability to use her hands and feet, including the ability to continuously feel, to frequently handle, and occasionally push/pull, the ability to frequently balance and occasionally climb, stoop, kneel, crouch, crawl, and reach, and the unrestricted ability to engage in activities involving heights, moving machinery, chemicals, noise, humidity, dust, temperature extremes, fumes, and vibrations.

6.   Through the date last insured, claimant's past relevant work as loan officer and bank branch manager did not require the performance of work-related activities precluded by claimant's residual functional capacity.

7.   Claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 1997, the amended alleged disability onset date, through December 31, 2002, the date last insured.

## STANDARD OF REVIEW

"Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards." *Olds v. Astrue*, No. 5:09cv319/RS/EMT, 2011 WL 691595, at *1 (N.D. Fla. Jan. 19, 2011); *see also Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."). Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate

to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938)).  The court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the Secretary[.]" *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990) (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

The Social Security Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  To qualify as a disability, the physical or mental impairment must be so severe that the plaintiff is not only unable to do her previous work, "but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(1)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(g), the Commissioner analyzes a disability claim in five steps:

1.  If the claimant is performing substantial gainful activity, she is not disabled.

2.  If the claimant is not performing substantial gainful activity, her impairments must be severe before she can be found disabled.

3.  If the claimant is not performing substantial gainful activity and she has severe impairments that have lasted or are expected to last for a continuous period of at least 12 months, and if her impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.  If the claimant's impairments do not prevent her from doing her past relevant work, she is not disabled.

5.  Even if the claimant's impairments prevent her from performing her past relevant work, if other work exists in significant numbers in the national economy that accommodates her residual functional capacity and vocational factors, she is not disabled.

Claimant bears the burden of establishing a severe impairment that keeps her from performing her past work. *See* 20 C.F.R. § 404.1512.  "If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Olds*, 2011 WL 691595, at *2.  "If the Commissioner carries this burden, the claimant must then prove [she] cannot perform the work suggested by the Commissioner." *Id.*

## FACT BACKGROUND AND MEDICAL HISTORY[2]

Plaintiff was born on May 18, 1954, making her 48 years of age on December 31, 2002, the date last insured.  T. 142, 859.  Claimant has a high school education and is able to communicate in English.  T. 58-59, 119.  Alleging disability beginning January 1, 1997, plaintiff cites a history of status post cervical fusion surgeries with residual intractable pain, headaches, and irritable bowel syndrome ("IBS") with gastritis.  T. 556, 621, 734-37, 921.  Claimant reported past work experience as a loan officer and bank branch manager.  T. 859.

---

[2] Although intended to be thorough, and to provide an overview of claimant's history of care and treatment, this synopsis of medical evidence will be supplemented as called for in the Analysis section.

Plaintiff cites an on-the-job injury that occurred in October 1989 as the source of her allegedly disabling impairments.  T. 63.  Following that incident, claimant was treated by an orthopedist, Dr. W.R. Hooper, M.D., who referred her to Dr. Charles N. Aprill, M.D., in New Orleans, Louisiana.  Dr. Aprill performed a cervical evaluation discogram with selective disc and facet joint injections on July 18, 1990.  The evaluation revealed "1. MRI and CT evidence of significant disc pathology at C4/5 (midline protrusion/prolapse) and C5/6 (left paracentral protrusion/prolapse).  2. Discographic evidence of symptomatic dysfunction, C3/4 disc contributing to right neck and headache pain. 3. Probable dysfunction, C5-6, C6-7 facet joints on the right contributing to right shoulder girdle and upper extremity symptoms."  T. 588.  Dr. Aprill noted "a large number of potential pain sources . . . and symptoms which suggest mechanical dysfunction."  T. 591.

Dr. Hooper referred plaintiff to neurosurgeon Bruce Raymon, M.D., who performed an anterior cervical diskectomy and fusion at the C5-6 level on March 26, 1992.   T. 621.   Due to continued pain, Dr. Raymon referred claimant to rheumatologist John L. Leutkemeyer, M.D., who treated Mrs. Weekley from February 18, 1993, to August 30, 1993.  Dr. Leutkemeyer diagnosed scapulocostal syndrome and fibromyalgia.  T. 577.  Joseph T. Saiter, Jr., M.D., examined plaintiff on August 12, 1993, when she complained of pain in her right shoulder.  Dr. Saiter reviewed claimant's MRI and provided her with injections.  T. 544-52.

Plaintiff subsequently came under the care of Dr. Frank John English Falco, M.D., who treated Mrs. Weekley from December 19, 1993, to January 6, 1996.  T. 391-438.  After an initial visit, Dr. Falco referred claimant for neuropsychological testing, which was performed by Dr. Peter Szmurlo.  T. 608-20.  Dr. Szmurlo assessed

chronic pain syndrome (with positive radiologic findings and status post surgical interventions), insomnia secondary to chronic pain, and IBS with poor tolerance of medications. Dr. Szmurlo recommended therapy, biofeedback, and hypnosis. T. 615-16.  On January 21, 1994, Mrs. Weekley was examined for the first time by pain management specialist Dr. Cesar Llanera, Jr., M.D.  T. 501.  Dr. Llanera observed trigger points and muscle spasms, and administered multiple injections due to plaintiff's reported intolerance to oral medications.  T. 463-505.  On February 6, 1995, claimant reported difficulty concentrating at work due to pain and again reported an inability to tolerate pain medications.  After consulting with Dr. Falco, Dr. Llanera agreed that plaintiff was suffering from a chronic pain syndrome and should be under the care of a psychiatrist to develop better coping skills.  T. 484-85. Receiving counseling from Joann Massey, Psy.D., claimant also attended biofeedback therapy to reduce muscle tension.  T. 755.

On referral from Dr. Falco, plaintiff saw Dr. Charles E. Chapleau, M.D., on April 20, 1995.   Dr. Chapleau, too, diagnosed chronic pain syndrome and recommended psychiatric intervention.  T. 603-04.  On March 6, 1996, Dr. Stephen Slobodian, M.D., assumed responsibility of care from Dr. Falco.  Dr. Slobodian recommended that claimant undergo a functionally-oriented therapy program and remain at work on a part-time basis.  T. 308-16.  Accordingly, plaintiff arrived at the Rehabilitation Institute of West Florida for an occupational rehabilitation evaluation on April 24, 1996.  T. 456-62.  The evaluating therapists recommended outpatient physical therapy and counseling sessions.  T. 462.  After plaintiff complained that therapy was exacerbating the pain, Dr. Slobodian ordered an MRI, which disclosed a non-union at the site of the 1992 cervical fusion surgery.  A CT scan confirmed the

non-union, at which time Dr. Slobodian recommended further neurosurgical care.  T. 340-42, 632, 641.

Claimant was discharged from the rehabilitation program on August 1, 1996, and returned to Dr. Chapleau, who agreed  "[s]he probably does have a nonunion at C5-6."  Dr. Chapleau referred plaintiff back to the original surgeon, Dr. Raymon, for a neurosurgical consultation  T. 602.  On October 4, 1996, claimant and Dr. Raymon scheduled further surgery of the failed fusion, but Mrs. Weekley cancelled the procedure on November 7, 1996.  T. 381-82.  Dr. Slobodian noted on December 2, 1996, that plaintiff would have the second cervical surgery after she heals from a recent hysterectomy.  T. 346.  At the recommendation of Dr. Llanera, claimant underwent an unsuccessful trial of a spinal cord stimulator.  T. 463-70, 530-43.

Ruben B. Timmons, M.D., examined plaintiff on February 24, 1998.  T. 734-37.  Dr. Timmons advised claimant that she would have to cope with the pain or proceed with the second fusion operation.  T. 737.  Plaintiff thus returned to Dr. Raymon on March 3, 1998, to move forward with the surgical procedure.  T. 558-59.  Dr. Raymon operated on April 14, 1998, performing "1. Partial microscopic corpectomies at C5 and C6.  2. Microscopic takedown of pseudoarthrosis C5-6 level. 3. Bilateral foraminot[o]mies and bank bone arthrodesis and anterior Atlantis instrumentation C5-6 level."  T. 665-71.

Four months following the 1998 surgery, claimant was sent for a second functional capacity evaluation, which rated her at sub-sedentary.  T. 675-81.  Dr. Timmons completed a form designating plaintiff "non-working status."  T. 753.  On June 7, 1999, Dr. Raymon confirmed two disc herniations.  Dr. Timmons, however, did not feel the herniations were symptomatic and recommended tertiary pain care.

T. 784, 916.  On August 16, 1999, Dr. Timmons wrote to Mrs. Weekley's workers' compensation attorney, stating, "I do believe with [claimant's] disc herniation at C-4 and her intractable pain that she is nonemployable."  T. 1042.  Both Drs. Timmons and Raymon assessed claimant to have met maximum medical improvement ("MMI"), each designating a 15% whole body permanent partial impairment rating. T. 875-76.  Plaintiff, presenting with additional gastrointestinal complaints on November 24, 1999, saw gastroenterologist Carl G. Speer, who performed an esophagogastroduodenoscopy.  T. 919-39.

After her Social Security disability insured status expired on December 31, 2002, claimant sought treatment through a primary care provider, Dr. Donna Judson, M.D.  T. 1010-25.  On January 14, 2004, neurologist George M. Dmytrenko, M.D., performed an EMG study, the results of which were normal.  T. 999-1002.  Dr. Dmytrenko recommended that plaintiff continue pain management treatment. T. 908-09.  On July 21, 2004, Dr. Speer diagnosed irritable bowel syndrome.  T. 1039.  An orthopedic surgeon, Dr. Leo Chen, M.D., evaluated Mrs. Weekley for a Social Security Consultative Examination on September 10, 2004, noting signs of impingement and spasms.  T. 984-93.

Following a May 2005 automobile accident, claimant underwent right rotator cuff surgery on June 22, 2006.  T. 1124.  The surgeon, Dr. Charles A. Roth, performed a consecutive surgery on the right shoulder on February 23, 2007, after which plaintiff noted some improvement. T. 1109, 1130.  On July 26, 2007, Dr. Chen again evaluated Mrs. Weekley on request from the Social Security Administration. From the corresponding x-rays, Dr. Chen determined that claimant suffers from

diffuse degenerative disc disease.  T. 1134.  Neurosurgeon Marcus Schmitz examined plaintiff on August 10, 2007, noting "terrible left paraspinous neck pain up to the nuchal ridge and around to the left ear."  Dr. Schmitz did not recommend further surgery.  T. 1149.  On October 29, 2007, Dr. Timmons responded to a request for clarification regarding his opinion as to Mrs. Weekley's work restrictions, which he had classified in hand-written notes as sub-sedentary and in the transcribed medical record as sedentary.  Dr. Timmons clarified that the records should have indicated a restriction placing claimant at the sub-sedentary physical demand level.  T. 1159.

Plaintiff returned to neurosurgeon Dr. Chapleau for a third cervical surgery on January 30, 2009.  T. 802-10.  The procedure consisted of an anterior cervical arthrodesis, C4-5, anterior cervical decompression, C4-5, insertion of an Atlantis plate, C4-C6, fashioning of an allograft, and removal of the old plate, C5-C6.  Dr. Chapleau extended the plating because the bone was "eggshell like" and the "C5 vertebral would not hold a disc distraction pin."  T. 808.

## HEARING BEFORE THE ALJ

The first administrative hearing commenced on April 2, 1998, with the testimony of Mrs. Weekley, who asserted that the non-union in her neck, as well as IBS, prevent her from returning to full-time employment.  T. 59-60, 62.  Claimant further testified that she gets migraine headaches three or four times per week.  T. 73.  On December 27, 2004, plaintiff appeared post-remand at a second administrative hearing, stating that her migraines had increased to four or five per week since the second cervical operation.  T. 1170-71.  Mrs. Weekley explained that she decided to undergo the spinal cord stimulator trial "because [she] was in so much pain [she]

would have done anything they needed to do to get [her] out of the pain." T. 1172. Claimant described the pain in her neck and left shoulder, likening it to "somebody taking a hot torch and just sticking it on my shoulder blade and turning it." T. 1172-73. A third administrative hearing was conducted on October 22, 2007. Plaintiff became emotional when questioned whether she wished to work, and again reported neck and left shoulder pain as her most debilitating symptoms. T. 1199-1200, 1203.

On March 13, 1998, Dr. Slobodian testified at a deposition administered by the workers' compensation insurance carrier's attorney and a workers' compensation attorney representing the claimant. The focus of the deposition was a review of plaintiff's performance on a jet ski, which she was filmed riding and operating on July 29, 1997. T. 246. Dr. Slobodian characterized Mrs. Weekley's actions as "incredibly stupid," but commented that claimant "does have real pathology in her neck." T. 254. Having viewed an edited version of the jet ski tape, Dr. Slobodian stated that such exertion significantly exceeded the limitations placed on Mrs. Weekley. T. 349.

At the supplemental hearing, the ALJ inquired of vocational expert J. Scott Lankford, Ph.D., as to claimant's work prospects:

> Keep the vocational factors the same, same work related limitations except let's add that the individual is expected to have the occurrence of pain and/or other symptoms of such duration, intensity and frequency as to prevent the performance of a regular work day or work week. Again, I define that as an eight-hour work day and a 40-hour work week. Would this limitation eliminate the jobs you identify in question number one?

(T. 122)  Lankford responded that such a medical and vocational profile would "eliminate all jobs in the national economy." (T. 122)  At the December 2004 hearing, Lankford opined that there would be no work available in the national economy for an individual, such as claimant, with limited lifting ability and inability to sit for longer than 20 minutes at a time.  T. 1182.  Another vocational expert, Leslie Gillespie, testified that based on the limitations discussed in the July 2007 report of Dr. Chen, no work would be possible.  T. 1205.

ANALYSIS

Plaintiff raises four issues in this appeal, arguing (1) that the ALJ erred by failing to articulate good cause for rejecting the opinion of claimant's treating physician, Dr. Timmons; (2) that the ALJ's finding as to plaintiff's credibility is not supported by substantial evidence; (3) that the ALJ erred by failing to execute the Appeals Council's remand order; and (4) that the ALJ erred by failing to apply the Eleventh Circuit's three-part pain standard.  Generally speaking, Mrs. Weekley maintains that the ALJ's decision should be reversed because, she contends, it is not supported by substantial evidence.  (Doc. 12, 16)

Claimant contends first that the ALJ erred by failing to establish good cause for rejecting the opinion of Dr. Timmons, one of plaintiff's long-standing treating physicians.  (Doc. 12, 16)  "The opinion of a treating physician . . . 'must be given substantial or considerable weight unless 'good cause' is shown to the contrary.'" *Phillips v. Barnhart*, 357 F.3d 1232, 1240 (11th Cir. 2004) (quoting *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir.1997)).  "'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence

supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records."  *Id.* at 1241.  "The ALJ must clearly articulate the reasons for giving less weight to the opinion of a treating physician, and the failure to do so is reversible error."  *Lewis*, 125 F.3d at 1440.

Dr. Timmons wrote a letter on October 12, 1998, asserting his belief that plaintiff functions at a sub-sedentary level.  Further, Dr. Timmons recalled that he encouraged Mrs. Weekley to seek employment in that capacity, with no overhead work.  T. 1043.  On December 28, 1998, Dr. Timmons signed a Limited Duty Form, stating that claimant would be unable to work or look for work "until further notice." T. 753.  In a treatment note dated July 29, 1999, Dr. Timmons observed that plaintiff's intractable neck pain would limit her to a sedentary level of work.  T. 786.[3] On August 16, 1999, Dr. Timmons composed a letter characterizing Mrs. Weekley as "nonemployable" due to disc herniations and "intractable" pain.  T. 793.  Dr. Timmons completed a form prepared by claimant's attorney in September 1999, reporting that plaintiff had reached maximum medical improvement, had permanent limitations to sub-sedentary work, and was non-employable.  T. 1041.

The ALJ concluded that Dr. Timmons' opinion regarding claimant's functional capacity was not entitled to "determinative evidentiary weight."  T. 822.  I am of a like mind with the ALJ on this point and can identify, as did the ALJ, "several significant factors which tend to erode the basis for Dr. Timmons' opinion, not the least of which is the evidence undermining the claimant's credibility as to the

---

[3] On December 19, 2002, however, Dr. Timmons revised the July 1999 statement found in his treatment notes, indicating instead that plaintiff would be capable of only sub-sedentary work.  T. 1159.

severity, frequency, and duration of her alleged symptomatology." T. 822.  First, the ALJ discussed two independent functional capacity evaluations, designed to test the limits of plaintiff's endurance and to ascertain, to a reasonable degree of medical certainty, plaintiff's physical capacities and limitations.  The ALJ determined that "neither of the evaluations could provide conclusive and valid opinions of the claimant's physical capacities and limitations because of the claimant's inconsistencies in performance, sub-effort, and symptom magnification behaviors." T. 822.  For instance, in a functional capacity evaluation dated August 20, 1998, the evaluator observed that Mrs. Weekley demonstrated "marginally consistent effort." T. 675.   The evaluator concluded that claimant did not meet the minimum requirements for classification at the sedentary work level, but only with regard to her lifting ability.  T. 679.  The evaluator also noted that plaintiff exhibited symptom magnifications such as pain ratings inconsistent with her behavior and an ability to transition from total cervical immobility to functional cervical mobility during the course of the evaluation.  T. 680.  After an April 2000 functional capacity evaluation, the evaluator could not comment on Mrs. Weekley's maximal ability because of her inconsistent effort.  T. 954.

Next, the ALJ cited "the documented objective findings recorded by the claimant's treating neurosurgeon, Dr. Raymon, as well as those of other physicians," which also fail to provide a basis for the opinion that claimant's level of physical function is sub-sedentary.  T. 822.  Although a cervical MRI performed in April 1999 revealed a right paracentral disc herniation at the C4-5 level and a small thoracic disc herniation at the T2-T3 level, Dr. Raymon observed that the C4-5 disc herniation was

located at the level above the fusion and on the asymptomatic side of plaintiff's neck. Dr. Raymon further noted that the thoracic disc herniation was not believed to be symptomatic and that nothing on the scan indicated nonunion or "slippage" of the instrumentation system. Stating that he could offer no additional beneficial treatment, Dr. Raymon concluded that Mrs. Weekley's clinical symptomatology did not suggest a cervical radiculopathy or cord compression. T. 784.

The ALJ also expressly considered the nature of claimant's treatment with Dr. Dmytrenko, a neurologist. T. 822. The evidentiary record reflects that plaintiff saw Dr. Dmytrenko on three occasions in 2004. T. 908-14. In January of that year, the doctor's examination revealed relatively full range of motion in Mrs. Weekley's neck, no radicular symptoms, normal muscle bulk, tone, and strength, as well as normal sensation. Dr. Dmytrenko obtained an MRI of claimant's cervical spine, which showed no intrinsic cord lesions and no obvious recurrent canal stenosis. Dr. Dmytrenko also performed EMG and nerve conduction studies of the left arm to rule out C6 radiculopathy; both studies were normal. Recommending only pain management, Dr. Dmytrenko suggested plaintiff "would best be served by using a muscle relaxant . . . ." T. 909.

Third, the deposition testimony of Dr. Slobodian, as the ALJ recognized, "does nothing to bolster Dr. Timmons' opinions and further undermines the claimant's credibility." T. 822. Dr. Slobodian, a physical medicine and rehabilitation specialist, provided relatively conservative treatment to plaintiff from March through December 1996. During his deposition testimony, Dr. Slobodian was questioned about a video surveillance tape obtained by Mrs. Weekley's workers' compensation insurance

carrier in 1997, which showed her riding a jet ski.  Dr. Slobodian had previously viewed the videotape in November 1997, at which time he noted that the activity in which claimant had taken part "significantly exceeds the limitations placed on her and patient's own stated disability status."  T. 630.

In his deposition, Dr. Slobodian identified two things that most disturbed him about the video: (1) the amount of time plaintiff spent not only riding the jet ski, but helping to load and unload the water craft from the accompanying trailer; and (2) the apparent absence of any signs of symptomatology, such as postural changes or facial expressions, after performing such activities.  Rather, Dr. Slobodian testified that Mrs. Weekley appeared happy and that he saw her smile several times during the video.  Moreover, Dr. Slobodian stated that at one point he viewed claimant helping carry a cooler with her left arm—an unexpected feat for someone who has complained persistently of pain and weakness in the left upper extremity.  T. 249-52. Based on Mrs. Weekley's levels of activity and exertion as demonstrated in the video, Dr. Slobodian withdrew his restriction of part-time sedentary work, stating instead that claimant would be capable of lifting up to 15 pounds and could perform light to medium activities on a full-time basis.  T. 256, 258-59.

Finally, the ALJ properly characterized as "vague" and unquantifiable Dr. Timmons' statements that claimant is neither employable nor capable of work search. T. 823.  As the ALJ discussed, a physician's opinion on issues reserved to the Commissioner of Social Security, such as a determination as to residual functional capacity or the existence of disability under the Social Security Act, is not entitled to controlling weight or special significance.  *See* SSR 96-5p, 1996 WL 374183, at *1-2

(July 2, 1996).  As far as the evidence will show, Dr. Timmons has no training in vocational rehabilitation such as might qualify him to render a credible opinion as to the availability of national and/or local jobs to an individual with plaintiff's particular physical capabilities and restrictions.  Accordingly, the ALJ properly discounted Dr. Timmons' statements regarding Mrs. Weekley's employability.  In sum, the ALJ established good cause for declining to assign determinative evidentiary weight to the opinion of Dr. Timmons, where the physician's opinion was not bolstered by the evidence and the evidence supported a contrary finding.  *See Phillips*, 357 F.3d at 1240-41.

Claimant contends next that the ALJ's finding as to her credibility is not supported by substantial evidence. (Doc. 12, 23) Specifically, the ALJ did not accept plaintiff's complaints of *disabling* pain:  "While it is credible that the claimant experiences some pain and functional limitations secondary to her herniated cervical discs and neck surgeries, it is not credible that she has experienced the level of pain and functional limitation to the extent she has alleged." T. 824.  It is within the ALJ's discretion to determine that a plaintiff's claims of pain and other symptoms are not credible.  *See Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  "But the ALJ's discretionary power to determine the credibility of testimony is limited by his obligation to place on the record explicit and adequate reasons for rejecting that testimony." *Id.*

The ALJ's decision reveals multiple factors that cast doubt on Mrs. Weekley's credibility.  First, claimant provided "conflicting excuses" as to why she decided to forego a second cervical fusion for nearly two years. T. 824.  At the recommendation

of Dr. Slobodian, an MRI was performed on June 24, 1996, which revealed a non-union at C5-6—in other words, the original anterior cervical diskectomy and fusion, performed by Dr. Raymon, had failed.  T. 340.  A CT scan confirmed the non-union on July 18, 1996, at which time Dr. Slobodian recommended additional neurosurgical intervention.  T. 342.  Claimant subsequently returned to Dr. Chapleau, who agreed "[s]he probably does have a nonunion at C5-6." Dr. Chapleau then referred plaintiff back to Dr. Raymon for a neurosurgical consultation.  T. 602.  On October 4, 1996, Mrs. Weekley scheduled a second cervical fusion procedure, but cancelled the surgery on November 7, 1996.  T. 381-82.  On February 24, 1998, Dr. Timmons advised claimant that she would have to cope with the pain or proceed with the second fusion operation.  T. 737.  Plaintiff returned to Dr. Raymon, who operated on April 14, 1998.  T. 558-59, 665-71.

When a claimant declines to follow prescribed treatment without good reason, she will not be found disabled.   *See* 20 C.F.R. § 404.1530(b).   The court acknowledges that where "[s]urgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment[,]" the claimant can establish good reason for failure to follow prescribed treatment.  *See* 20 C.F.R. § 404.1530(c)(3).  Here, however, the ALJ did not rely merely on the gap between the surgical recommendation and the performance of the procedure in questioning plaintiff's credibility.   Rather, the ALJ also cited Mrs. Weekley's inconsistent explanations for her lack of compliance.  T. 824.  In deposition, Dr. Slobodian testified that claimant's attorney explained that Mrs. Weekley was afraid to undergo the surgery because the first such procedure had failed.  T. 242.  Later,

however, plaintiff reported to Dr. Slobodian that she was delaying the second cervical fusion because she was recovering from a hysterectomy and was physically too weak to endure another surgery at the time.  T. 637.    In effect, then, Mrs. Weekley failed to follow prescribed treatment.  *See* 20 C.F.R. § 404.1530(a) (providing that a claimant seeking benefits "must follow treatment prescribed by [her] physician if this treatment can restore [her] ability to work").

Second, the jet skiing incident seriously undermines plaintiff's credibility.  As discussed, claimant's workers' compensation insurance carrier obtained a video surveillance tape showing claimant riding a jet ski sometime in 1997.  The tape also revealed plaintiff loading and unloading the jet ski, lifting a cooler above the level of a truck bed with her left arm, and gesturing several times with the same appendage. T. 252.  Dr. Slobodian testified that the video tape showed Mrs. Weekley engaged in activities that significantly exceeded the limitations he had placed on her.    Claimant denies that the jet skiing incident damages her credibility, arguing instead that "participation in everyday activities of short duration, such as housework or fishing," does not disqualify a claimant from disability.  *See Lewis*, 125 F.3d at 1441.  Jet skiing could not reasonably be described as an "everyday" activity like shopping, cooking, or even fishing or hunting.  On the contrary, jet skiing is a sport that requires considerable strength, frequent shifting of body weight, and the ability to withstand significant and repeated impact traumas.    Unretouched photographs and video, although sometimes subject to explanation, are generally so helpful or damning, as the case here, precisely because of their objective portrayal of reality.  That plaintiff was able to maneuver a jet ski and lift a cooler with her left arm—without apparent

difficulty or discomfort, according to Dr. Slobodian—brings into question her credibility regarding her pain and subjective disabled status.

Third, the ALJ relied on objective medical evidence and the opinions of treating physicians that further weaken Mrs. Weekley's credibility.  T. 825.  Claimant's treating neurosurgeon, Dr. Raymon, indicated in September and October 1998 that she is capable of performing sedentary work activities on a regular and sustained basis.  T. 750.  In June 1999, moreover, Dr. Raymon stated that plaintiff's symptomatology is not that of a cervical radiculopathy or cord compression, "neither of which she actually has."  Following the second cervical fusion, Dr. Raymon could find no diagnostic evidence that indicated nonunion or "slippage of the instrumentation system."  Again, although the most recent MRI revealed two small disc herniations, Dr. Raymon did not believe them to be symptomatic.  T. 784, 916.

Furthermore, one of Mrs. Weekley's treating pain management physicians, Dr. Timmons, stated in July 1999 that she could perform work at the sedentary level.  T. 785-92.  Dr. Dmytrenko examined claimant in March 2004, but, as the ALJ noted, "failed to document objective clinical findings corresponding to the claimant's alleged symptomatology." T. 825.  A January 2004 MRI of the cervical spine showed no intrinsic cord lesions and no obvious recurrent canal stenosis, and EMG and nerve conduction studies returned normal.  T. 909, 1000.  Dr. Chen, who examined plaintiff in September 2004, also concluded that she would be capable of performing work activities at the sedentary exertional level, despite pain and functional limitations relative to the neck and left shoulder.  T. 990-93.  The foregoing diagnostic tests and

medical opinions do not bespeak a patient in almost constant severe pain and thus undercut Mrs. Weekley's credibility.

Claimant's credibility is also diminished by a series of inconsistent statements regarding her daily activities, which an ALJ may consider as a factor in making credibility determinations. *See Harwell v. Heckler*, 735 F.2d 1292, 1293 (11th Cir. 1984). For instance, plaintiff testified at the second administrative hearing that she cooks three meals a day. T. 1177-78. Plaintiff reported to Lawrence Prokop, D.O., that she can prepare meals, straighten the house, drive an automobile, shop for groceries, take walks, and swim. T. 441. In the paperwork she completed in connection with her application, however, Mrs. Weekley stated that severe headaches sometimes prevent her from cooking at all. T. 166.

The record also indicates claimant has complained of difficulty sleeping because of her pain. T. 1124, 1151. Yet plaintiff testified that she usually sleeps eight hours per night. T. 1176-77. Mrs. Weekley testified further that she experiences frequent, debilitating migraine headaches. T. 1004, 1008, 1170-71. In January 2003, however, claimant reported only occasional migraines to Dr. Judson. T. 1015. These inconsistent statements to various sources throughout the period under consideration, none of which might be fatal to plaintiff's credibility when considered alone, cast doubt on the veracity of her allegations when considered in their totality. The court thus determines that the ALJ fulfilled his obligation to place on the record explicit and adequate reasons for discrediting Mrs. Weekley's testimony as to her degree of pain and functional limitation. *See Holt*, 921 F.2d at 1223. Claimant argues that the ALJ failed to properly apply Eleventh Circuit law, citing the

ALJ's allegedly improper reliance on claimant's receipt of unemployment benefits and disinclination to use pain medication.  Assuming *arguendo* the ALJ misapplied the law regarding unemployment benefits or failed to account for plaintiff's allergy to pain medications, I nonetheless conclude that the ALJ's credibility determination is supported by substantial evidence, as detailed *supra*.

Plaintiff also claims error in the ALJ's alleged failure to comply with the Appeals Council's remand order.  (Doc. 12, 28-29)  On June 2, 2004, the Appeals Council remanded the case to the ALJ with instructions to "[o]btain evidence from a medical expert, preferable [sic] an orthopedist, to clarify the nature and severity of the claimant's impairment(s) . . . including whether the impairment(s) meet or equal the severity of an impairment listed in Appendix 1, Subpart P, Regulations No. 4." T. 844-45.  Having determined that the ALJ's decision did not comply with the remand order, the Appeals Council remanded the case a second time, with the same instruction to obtain evidence from a medical expert, preferably an orthopedist, to clarify the nature and severity of claimant's impairments. T. 1073-74. Mrs. Weekley now contends that the ALJ again failed to obtain an opinion from a medical expert as to whether her impairments meet or equal a listed impairment.

In accordance with the second remand order, the ALJ did obtain evidence from a medical expert clarifying the nature and severity of claimant's impairments.  Dr. Chen, an orthopedic surgeon, performed a consultative evaluation of plaintiff on July 26, 2007. T. 1134-45. Dr. Chen indicated that Mrs. Weekley can do sedentary work, but is restricted to lifting no more than ten pounds. T. 1205.  The ALJ ultimately found "no indication that the findings and opinions of the examining orthopedist . .

. relate back to the period under consideration, January 1, 1997 through December 31, 2002." T. 819.  That the ALJ discounted Dr. Chen's findings and opinions as too remote from the period under consideration does not invalidate the ALJ's compliance with the remand order.  To the extent the ALJ failed to elicit an opinion from Dr. Chen as to whether claimant's impairments meet or equal the severity of a listed impairment, the court does not find this error harmful.  Plaintiff cites no authority, nor is the court aware of any, holding that failure to comply with a remand order is reversible error *per se*.  Rather, the claimant must show some likelihood that the error affected her substantial rights.  *See* FED. R. CIV. P. 61; *Aetna Cas. and Sur. Co. v. Gosdin*, 803 F.2d 1153 (11th Cir 1986) ("[I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." (quoting *Kotteakos v. United States*, 328 U.S. 750 (1946))); *Reeves v. Heckler*, 734 F.2d 519, 524 (11th Cir. 1984) (characterizing challenge to ALJ's conclusion as harmless error where ALJ considered the relevant evidence in making the disability determination).  Here, plaintiff offers neither argument nor evidence tending to establish that her impairments meet or medically equal a listing.  (Doc. 12, 28-29)

Finally, claimant argues the ALJ committed reversible error by failing to apply this Circuit's three-part pain standard in discrediting claimant's subjective complaints of pain.  (Doc. 12, 29-31)  "The Secretary must consider a claimant's subjective testimony of pain if she finds evidence of an underlying medical condition, and either (1) objective medical evidence to confirm the severity of the alleged pain arising from

that condition, or (2) that the objectively determined medical condition is of a severity that can reasonably be expected to give rise to the alleged pain." *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995). "A claimant's subjective testimony supported by medical evidence that satisfies the pain standard is itself sufficient to support a finding of disability." *Id.* at 1561. As already established, the ALJ may decide not to credit such testimony, provided she articulates "explicit and adequate reasons for doing so." *See Holt*, 921 F.2d at 1223. "Failure to articulate the reasons for discrediting subjective pain testimony requires, as a matter of law, that the testimony be accepted as true." *Id.*

Failure to cite or refer to the language of the three-part test is not reversible error, however, where the ALJ cites to 20 C.F.R. § 404.1529, "which contains the same language regarding the subjective pain testimony that [the Eleventh Circuit] interpreted when initially establishing its three-part pain standard." *See Wilson v. Barnhart*, 284 F.3d 1219, 1226 (11th Cir. 2002). The instant decision by the ALJ, though it does not set forth the Eleventh Circuit's three-part pain standard, indicates that the ALJ engaged the requisite legal considerations. T. 814-28. The ALJ clearly found evidence of an underlying medical condition, determining that claimant possessed the following severe impairments:  status post cervical diskectomy and fusion, status post re-do cervical diskectomy and fusion with instrumentation, cervical degenerative disc disease, and muscle tension headaches.  T. 817.

Having identified evidence of an underlying medical condition, the ALJ considered claimant's symptoms and subjective testimony of pain in accordance with the two-part standard set forth in 20 C.F.R. § 404.1529, which asks first whether "the

medical signs or laboratory findings show that [claimant has] a medically determinable impairment(s) that could reasonably be expected to produce [her] symptoms." *See* 20 C.F.R. § 404.1529(c)(1).  Once an underlying physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the ALJ must "evaluate the intensity and persistence of [claimant's] symptoms . . . [to] determine how [those] symptoms limit [her] capacity for work." *See id.*  In express terms, the ALJ confirmed his strict compliance with this standard:

> In making the above [credibility] finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p.  After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could have been reasonably expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

T. 827.  As analyzed above, the ALJ articulated "explicit and adequate reasons" for not fully crediting Mrs. Weekley's subjective complaints of pain.  *See Holt*, 921 F.2d at 1223.  In making a credibility determination, the ALJ adhered to the rules set forth in 20 C.F.R. § 404.1529, and thus faithfully applied this Circuit's pain standard. Where, as here, the ALJ has conducted a thorough examination of the record and properly considered claimant's medical condition as a whole to reach a determination supported by substantial evidence, this court may not reverse the Commissioner's decision.  *See Carnes*, 936 F.2d at 1218 ("[T]his Court may reverse the decision of

the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied.").

Accordingly, it is respectfully RECOMMENDED:

The application for disability insurance benefits be DENIED.

At Pensacola, Florida, this 1st day of November, 2011.

/s/ *Charles J. Kahn, Jr.*

**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within fourteen days after being served a copy hereof. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control</u>. A copy of any objections shall be served upon the magistrate judge and all other parties. Failure to object may limit the scope of appellate review of factual findings. *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).